UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | Cr. No. 07-100S |
| | ) | |
| OMAR ALTAMIRANO-NUNEZ | ) | |
| a/k/a Juan Carlos Diaz Delgadillo, | ) | |
| a/k/a Burras, and | ) | |
| IDELFONSO BETANCOURT- RODRIGUEZ, | ) | |
| a/k/a Chaco, and | ) | |
| RAFEL FERNANDEZ-ROQUE, | ) | |
| a/k/a Rafael Hernandez-Roque, and | ) | |
| ADOLFO VERDUGO and | ) | |
| JUAN MANUAL CASILLAS | ) | |

**THE UNITED STATES' RESPONSE TO DEFENDANT ADOLFO VERDUGO'S MOTION TO REVOKE OR AMEND DETENTION ORDER**

Comes now the United States of America, by and through its attorneys, Robert Clark Corrente, United States Attorney, and Mary Rogers, Assistant United States Attorney, and hereby responds to Defendant Adolfo Verdugo's Motion to Revoke or Amend Detention Order.

On July 25, 2007, Defendant Verdugo was indicted on charges of Conspiracy to Distribute and to Posses with Intent to Distribute Five Kilograms or More of Cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). A warrant was issued and he was arrested in California. In a hearing on July 26, 2007, before Magistrate Judge Victor B. Kenton in the United States District Court for the Central District of California, Verdugo was released on $250,000 bond. Defendant posted bond by deeding his residence. His travel was restricted to the District of Rhode Island only for the purpose of appearing for this matter. He also surrendered his passport and was put under electronic surveillance.

On August 9, 2007, a summons was issued for Verdugo in the District of Rhode Island and his arraignment was scheduled for August 17, 2007. After a continuance requested by defense counsel, his detention hearing was held on September 4, 2007, without objection by the Defendant, before Magistrate Judge Lincoln D. Almond who remanded the Defendant to custody.

On September 11, 2007, Defendant filed the instant motion requesting the Court to revoke or amend the detention. In his motion Defendant claims that Magistrate Judge Almond (1) ignored compelling evidence that the Defendant will appear as required (2) improperly shifted the burden of persuasion from the government to the Defendant (3) relied upon the confession that was given by the Defendant after he was given the Miranda warning in English (4) entered an order that was otherwise affected by error of law and fact.

## ARGUMENT

### A. MAGISTRATE JUDGE ALMOND HAD JURISDICTION TO HOLD A DETENTION HEARING PURSUANT TO 18 U.S.C. §§ 3141 AND 3142

The Defendant cites United States v. Dillon, 938 F.2d 1412 (1st Cir. 1991) for the proposition that a party is required to put forward his best factual case at the bail hearing, and does not have the right to a second hearing in order to put forward facts that were known to him at the first hearing. Dillon, 938 F.2d at 1415. The Defendant attempts to construe this holding into a claim that, because the Magistrate Judge in California made a decision concerning Verdugo's detention pending removal to the District of Rhode Island, that a second hearing is prohibited in the charging District of Rhode Island. The Defendant raises this objection for the first time on appeal. The Defendant made no objection at the time of the detention hearing. In any event, the Bail Reform Act holds otherwise. "A judicial officer *authorized to order the arrest*

*of a person* . . . before whom an arrested person is brought shall order that such person be released or detained, pending judicial proceedings . . ." 18 U.S.C. §3141(a)(emphasis added). In the present case, the indictment was issued by a Grand jury in the District of Rhode Island and Rhode Island District Magistrate Judge Almond issued the arrest warrant for the Defendant. Therefore, Magistrate Judge Almond was the appropriate forum before whom the Defendant's detention hearing was held. "The decision whether to seek detention and the evidence necessary to support a finding of dangerousness and risk of flight sufficient to justify detention will normally be located primarily in the district of prosecution." United States v. Melendez-Carrion, 790 F.2d 984, 990 (2nd Cir. 1986).[1]

United States v. Dillon, cited in support of Defendant's newly raised claim, rejected a Defendant's assertion that he was entitled to present new evidence regarding detention before the District Court Judge[2], after having had a detention hearing before a Magistrate Court Judge in the same District. United States v. Dillon, 938 F.2d 1412 (1st Cir. 1991). Dillon did not address the factual basis in Verdugo's case; the removal hearing in California determined whether to detain the Defendant pending appearance in the charging District of Rhode Island. Detention hearings are routinely held in the District of prosecution, for a number of practical reasons, not least of which is the fact that the parties in possession of the evidence are invariably in the charging district. Defendant has failed to cite to any case law supporting his proposition that the charging

---

[1] The Second Circuit case noted that in circumstances where a Defendant might wish to present evidence concerning his roots in the arresting district, the evidence could then be transcribed and furnished to the judicial officer in the charging district. Melendez-Carrion, 790 F.2d at 990.

[2] In that case, Rhode Island District Court Judge Ernest C. Torres.

District is not entitled to a hearing regarding whether to detain a Defendant.

Additionally the Defendant's arguments are irrelevant because he has failed to establish any factual predicate for two of his central arguments. One, he has failed to show what was and what was not introduced in California. Two, he has not shown that only Task Force Naylor heard the Defendant's confession.[3] The Defendant has presented no evidence that the evidence presented before Magistrate Judge Almond was substantively different than the evidence presented before Magistrate Judge Kenton in California. The Defendant has filed the instant appeal without having available either the transcript of the hearing before Magistrate Kenton Almond or Magistrate Judge Kenton[4]. This is problematic for the additional reason that the government's recollection of the detention hearing before Magistrate Judge Almond is markedly different in several respects than the Defendant's. The burden lies on the Defendant in this appeal. The detention hearing before Magistrate Judge Almond was properly held.

**B. DEFENDANT WAS PROPERLY DETAINED PURSUANT TO 18 U.S.C. § 1342**

Pursuant to 18 U.S.C. § 3142, also know as "The Bail Reform Act", the judicial officer shall order that, pending trial, the Defendant be (1) released on his own recognizance or upon execution of an unsecured bond; (2) released on a condition or combination of conditions; (3) temporarily detained to permit revocation of conditional release, deportation, or exclusion; or (4) detained. United States v. Pierce, 107 F.Supp. 2d 126, 130-131 (D.Ma. 2000); 18 U.S.C.

---

[3] While the Defendant claims that only Task Force Agent Naylor heard the Defendant's confession in California, to the contrary, TFA Naylor testified that Special Agent Cardello and Detective Machado were also present during the interview.

[4] The Assistant United States Attorney who handled the detention hearing before Magistrate Judge Kenton did state to the undersigned that she had inform the Magistrate that the Defendant had confessed following his arrest.

§ 3142(a). "[T]he judicial officer may detain a person pending trial only if, after a detention hearing held pursuant to 18 U.S.C. § 3142(f), the judicial officer determines that 'no condition or combination of conditions [set forth under 18 U.S.C. § 3142(b) or (C)] will reasonably assure the appearance of the person as required and the safety of any other person and the community.'" Id.; 18 U.S.C. § 3142(e). In United States v. Salerno, 481 U.S. 739, 747 (1987) the Supreme Court cautioned that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." Id. at 755. "For this reason, the Defendant may be detained only if the judicial officer finds by (1) clear and convincing evidence, that the Defendant is a danger to the community, or (2) a preponderance of the evidence, that the Defendant poses a risk of flight." Pierce, 107 F.Supp2d at 131 (citations omitted). "Furthermore, the judicial officer 'may not impose a financial condition that results in the pretrial detention of the person.'" Id.; 18 U.S.C. § 3142(C).

The Bail Reform Act establishes procedures for determining if a person should be detained. Id. The Government is entitled to move for detention where the Defendant is charged with one of the offenses enumerated in 18 U.S.C. § 3142(f)(1) which Congress has determined that detention is warranted:

> (A) a crime of violence, or an offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed;
> (B) **an offense for which the maximum sentence is life imprisonment or death**;
> (C) **an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46**;
> (D) any felony if such person has been convicted of two or more offenses described in subparagraphs (A) through (C) of this paragraph, or two or more State or local offenses that would have been offenses described in subparagraphs (A) through (C) of this paragraph if a circumstance giving rise to Federal

> jurisdiction had existed, or a combination of such offenses; or
> (E) any felony that is not otherwise a crime of violence that involves a minor victim or that involves the possession or use of a firearm or destructive device (as those terms are defined in section 921), or any other dangerous weapon, or involves a failure to register under section 2250 of title 18, United States Code.

18 U.S.C. § 3142(f)(1) (emphasis added).

The Government, or the judicial officer on his or her own, may also move for detention, where the case involves a serious risk that the Defendant will flee or will obstruct or attempt to obstruct justice. 18 U.S.C. § 3142(f)(2).

Once the motion for detention has been made, the Court must then determine whether any condition or combination of conditions will adequately ensure the appearance of the Defendant and the safety of the community against any danger posed by the Defendant's release. Pierce, 107 F.Supp.2d at 131. 18 U.S.C. 3142(e) also includes the rebuttable presumption "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probably cause to believe that the person committed an offense for which a maximum term of imprisonment of ten years or more is prescribed. . . ." 18 U.S.C. 3142(e).

In order to determine if any "condition or combination of conditions will reasonably assure the appearance of the person or the safety of any other person and the community," the Court must consider the following:

> **(1)** the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
> **(2)** the weight of the evidence against the person;
> **(3)** the history and characteristics of the person, including--
> **(A)** the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past

> conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
> **(B)** whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
> **(4)** the nature and seriousness of the danger to any person or the community that would be posed by the person's release. In considering the conditions of release described in subsection (c)(1)(B)(xi) or (c)(1)(B)(xii) of this section, the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.

18 U.S.C. 3142(g).

In essence, the issue comes down to, is the Defendant's one time voluntary appearance in the District of Rhode Island Court alone sufficient to rebut the presumptions that he is a danger to the community and a risk of flight.

**1. <u>Nature of the Offense</u>**

Defendant has been indicted for Conspiracy to Distribute and Possess with Intent to Distribute 5 Kilograms or More of Cocaine, an offense which carries a mandatory minimum penalty 10 years and a maximum penalty of life[5]. The fact that his charge carries a penalty of 10 years or more (and in fact carries a mandatory minimum of 10 years) places this case in the rebuttable presumption category. To rebut the presumption requires that the Defendant provide proof that he is not a flight risk nor a danger to the community.

Defendant contends that the previously set bail of $250,000 coupled with the electronic monitoring device is sufficient to guarantee Defendant's appearance at trial. He further contends

[5] Even if the Defendant were Safety Valve eligible, he still faces 151 - 188 months incarceration if convicted after trial and on a plea, assuming he were to receive 3 points off for acceptance of responsibility, he faces 108-135 months incarceration.

that he had ample opportunity to flee following the events that occurred on May 30, and following his arrest, but did not.

The Government contends that no condition or combination of conditions will assure the appearance of the Defendant or the safety of the community. The government further contends that the Defendant did not flee following the events of May 30, 2007, because he did not believe he would be arrested on the underlying charges. On May 30, 2007, in the early morning hours, the Defendant had parked his tractor trailer truck and was waiting in the rest area. He had driven across country from California with 29 kilograms of cocaine. The Defendant was intercepted over a court authorized wiretap making arrangements for two of the co-defendants to drive alongside his truck, stop briefly, and pass the 29 kilograms in a duffle bag to the co-defendants. The co-defendants then drove away, back onto the highway, while Verdugo was again intercepted verifying that the delivery had been successful. Unbeknownst to Verdugo, his co-defendants were stopped further up the highway and the 29 kilograms of cocaine were seized. The Massachusetts State Police questioned Verdugo, but by the time that he was questioned by the state police, he had already disposed of the cocaine. A drug dog was used to search the trailer and did not detect the presence of drugs. After being questioned by the police, his cellular telephone which he admitted was his, was seized by the police. The Defendant was then allowed to leave in his vehicle. As the Defendant had no idea that a wiretap had intercepted his communications, and he was not in possession of the drugs at the time the police questioned him, he had no reason to believe that he would be charged later. The subsequent indictment charging the Defendants was kept sealed until Verdugo was arrested.

**2. Weight of the Evidence**

The Government has overwhelming evidence that Defendant committed the crime for which he has been indicted. On May 29 and 30, 2007, Defendant's telephone calls were intercepted pursuant to a federally authorized wiretap investigation in which he spoke with the co-defendants and made arrangements to deliver 29 kilogram of cocaine. Following the delivery, he again spoke with co-defendants confirming that the cocaine had been successfully delivered. Furthermore, when he was arrested in California on these charges, the Defendant made a full confession to the DEA, admitting to both the delivery and the intercepted conversations.

As pointed out previously the Defendant filed this motion before the transcript of the detention hearing was finished. He bases his argument on his memory of the proceedings. The government's recollection is different on several points. The evidence did not amount to "mere presence." Police visual surveillance observed one of the co-defendant vehicles park beside Verdugo's tractor trailer truck and then drive back onto the highway within minutes. Electronic intercepts included conversation of Verdugo talking to co-defendant Altamirano, arranging the delivery of the cocaine and then confirming that the cocaine had been delivered. The drug dog did not find drugs in Verdugo's truck because he had already passed them to his co-defendants. Pen register and wiretap data prove that Verdugo's cellular telephone was in contact with the co-defendants telephones and was the telephone used in the above-referenced conversations. The Defendant admitted after being *Mirandized* that he made the delivery and also admitted to the conversations[6]. The standard for a waiver of *Miranda* warnings is whether it was voluntary. To

---

[6] TFA Naylor testified before Magistrate Judge Almond that Verdugo and Naylor had joked about one particular intercept in which Verdugo had told the co-defendant to meet him "where the Simpsons live." This was a coded reference to meet in Springfield, Massachusetts, the

be considered voluntary it must be knowing and intelligent. Miranda v. Arizona, 384 U.S. 436 (1966). The Defendant is a naturalized American citizen. In order to become a citizen he was required to pass an English proficiency examination. The Defendant is bi lingual. Task Force Agent Naylor, to whom the Defendant confessed, testified that he had no difficulty understanding the Defendant's English and also, that the Defendant exhibited no signs that he was having difficulty understanding TFA Naylor. The Defendant appeared to understand the *Miranda* warnings, and in fact, at the police station stated that he had decided he wanted an attorney. Clearly, the Defendant understood his constitutional rights and his initial waiver was both knowing and voluntary.

In addition to the recitation of facts in the previous section, **1. Nature of the Offense**, the government stated that Verdugo was not arrested at the time his co-defendants were arrested, in order to protect the integrity of ongoing wiretaps in both Massachusetts and San Diego[7]. The government sealed the indictments issued by the grand jury on July 11, 2007, until the arrest of Verdugo, so as not to enable his co-defendants to provide him with notice and thus give him an opportunity to flee. It is the government's strongly held belief, supported by both common sense and the Congressional rebuttable presumption, that the Defendant will not appear once sentencing is imminent. His voluntary appearance in Rhode Island was to ascertain the strength of the government's case against him, and to buy himself time to determine how to minimize the loss of the $250,000 bail that he has posted. With no ties whatsoever to the District of Rhode Island,

---

home of the popular fictional television series, *The Simpsons*, carried on the Fox network.

[7] The Massachusetts wiretap resulted in the seizure of 14 kilograms of cocaine, valued at approximately $238,000 - $322,000, from the same organization the following week.

and the ability to drive across the border into Mexico, the country where he grew up, the likelihood of the Defendant appearing in Rhode Island to be sentenced to a lengthy term of imprisonment is so negligible as to not warrant his release on bail.

**3. The History and Characteristics of the Defendant**

According to the Memorandum in Support of his Motion to Revoke or Amend Detention Order, Defendant was born in Mexico in 1966 and immigrated to the United States where he became a naturalized citizen. He resides with his wife, who speaks only Spanish, and his three children in Pomano, California. He owns and operates an International Harvester tractor and earns his family's living as a tractor trailer driver throughout the country.

Defendant's parents and sibling are in Mexico. In fact, Defendant traveled to Mexico twice in 2007. He is bilingual and can live in Mexico just as easily as the United States. His residence is just hours from the border with Mexico where he has strong family ties. He will not be forced to make a choice between his freedom in Mexico and his wife and children. His wife speaks only Spanish and his family can easily move with him to Mexico.

Furthermore, the Defendant has no ties to the Rhode Island Community. In United States v. Pierce, the Defendant drove a getaway car in an attempted robbery of a marijuana dealer. That Defendant did have ties to Massachusetts the prosecuting district, unlike Verdugo, who has no ties to the District of Rhode Island. The Pierce Court upheld the magistrate's finding that the Defendant's ties to the district of Florida constituted a flight risk. 107 F. Supp. 2d 126 (D. Mass. 2000). In United States v. Palmer-Contreras, two Defendants were arrested in possession of a 195 kilograms of cocaine. 835 F.2d 15 (1988). The magistrate's granting of bail was overturned by the trial judge who was in turn upheld by the First Circuit. The court noted that while the

Defendants were likely mules in the transaction and thus a drug organization might be less likely to finance the flight of its mules, that given the value of the cocaine nothing was assured. 835 F.2d 15 (1st Cir. 1988). The First Circuit went on to emphasize that the rebuttable flight presumption reflects Congress's findings that drug traffickers often have the resources and foreign contacts to escape to other countries. Forfeiture of even a large bond may be just the cost of doing business and hence drug traffickers pose a special flight risk. Given the highly lucrative nature of the drug trade this presumption of flight is aimed specifically at drug traffickers. This Defendant has profited from his illegal activities and he has concrete connections to his native country of Mexico. The Probation report reflects that the Defendant has made roughly $36,000 a year, supports a wife and three children, yet had $250,000 to post for his release in California[8]. This Defendant is exactly the type of Defendant Congress had in mind regarding the presumption.

In United States v. Arndt, The Defendant was charged with conspiracy to distribute methamphetamine. 329 F. Supp. 2nd 182 (D. Mass. 2004). He accepted a package in the mail of approximately one pound of methamphetamine. The Court pointed out that a Defendant may be considered a danger to the community even in the absence of a finding that an accused will engage in physical violence. The concept of dangerousness is described in terms of safety to the community. This is intended to cover both danger to a particular witness or individual as well as the risk that the Defendant will engage in activity to the detriment of the community. This danger includes drug trafficking. In that case the Defendant was born in Connecticut, was a doctor with

---

[8] Magistrate Judge Almond stated that his understanding was that the Defendant had purchased the home for $128,000, and that the $250,000 was equity in the house. The government still believes that it is unlikely that a family of four living on $36,000 a year in a Los Angeles suburb, would have sufficient funds left over to purchase even a $128,000 home.

his degree from Harvard University, and also had a child and family in New England. He had his license to practice medicine suspended two years earlier and had been working in carpentry. The Defendant had a romantic partner who was a Venezuelan national and the court found that it was possible that the lengthy period of incarceration might prompt the Defendant and his partner to flee to Venezuela.

In United States v. Burgos, 176 F.Supp.2d. 106 (D. Puerto Rico 2001), the Defendant was charged with conspiracy to distribute cocaine and marijuana. Bail was set at $150,000 by the magistrate and on appeal the court found that the Defendant had failed to rebut the Bail Reform Act presumption that the length of sentence in the event of conviction precluded the existence of any conditions that would secure his appearance if released prior to trial. As the court pointed out the nature of the case favored detention. The court went on to note again that - despite strong community ties - the amount of drugs was significant, the government's case appeared strong, the length of the jail sentence and the Defendant's ties to drug traffickers all pointed to a risk of flight. The presumption of danger to the community is present since it was clear that the harm to society caused by narcotics trafficking is encompassed in Congress' definition of danger to the community. The court went on to point out Congress' concern that flight to avoid prosecution is particularly high among persons charged with major drug offenses and that drug traffickers often have established ties outside the United States and have both the resources and foreign contacts to escape to other countries. Defendant Verdugo fits these same concerns in every respect.

In United States v. Villanueva-Rodriguez, 190 F. Supp.2d 257 (D. Puerto Rico 2002), the Defendant was found in possession of just under 4 kilograms of heroin. In that case the trial court

pointed out that the Defendant had only proffered evidence concerning risk of flight. The posting of bail did not rebut the presumption of dangerousness established by the statute. And the court further found that the danger of flight to avoid prosecution was very strong given the major drug offense with which the Defendant had been charged.

In United States v. Hilario-Reyes, 218 F.Supp 2d 185 (D. Puerto Rico 2002), the Defendant was charged with conspiracy to possess 5 kilograms of more of cocaine. The court pointed out that the magistrate judge should keep in mind that Congress had found that drug offenders as a general rule pose special risks of flight. Even after a Defendant produces evidence to rebut the presumption the presumption does not disappear but rather retains evidentiary weight - the amount depending on how closely the Defendant's case resembles the Congressional paradigm. That Defendant had strong community ties but was charged in a conspiracy where the police seized 8 kilograms of cocaine at an airport carousel and the Defendant was seen standing near the carousel although he was not arrested until three years later.

**4. Nature and Seriousness of Danger to any Person or the Community**

Defendant's involvement with the drug organization that he works with should be considered dangerous enough to deny this motion. Defendant delivered 29 kilograms of cocaine using his tractor trailer truck. A kilogram of cocaine in this area is worth between $17,000 to $23,000 a kilogram. Therefore Defendant delivered between $493,000 to $667,000 worth of drugs to his co-defendants in Springfield, Massachusetts on May 30, 2007. The government does not agree with the Defendant's contention that someone entrusted with roughly a half a million dollars worth of cocaine qualifies for a minor role.

In United States v. Dillon, the district court held a hearing and denied an appeal from the magistrate court's order, ordering that the Defendant be detained prior to trial. In upholding both the magistrate's and district court's decisions to detain the Defendant, the appeals court noted that the court had applied the factors listed in §3142(g) and had determined that the offenses charged were of "considerable magnitude," that the weight of the evidence against the Defendants was "strong" (consisting of taped interactions with the undercover DEA agents) and that Defendant had a prior record. The district court had also concluded that the Defendants had not rebutted the presumption of risk of flight, especially in light of the minimum mandatory term of imprisonment of five years and the amount of money ($8,000,000) brought up in the taped conversations. The Court also concluded that "drug trafficking of this magnitude is, *per se,* a danger to the community...." 938 F.2d 1412, 1414-1415 (1st Cir. 1991).

As previously noted, Defendant Verdugo faces a minimum mandatory penalty of ten years, has admitted to trafficking in a substantial quantity of cocaine, 29 kilograms, worth approximately half a million dollars. His actions are also, *per se*, dangerous to the community.

## C. CONCLUSION

For all of the foregoing reasons the Defendant's motion should be denied.

Respectfully submitted,

UNITED STATES OF AMERICA,

By its Attorneys,

ROBERT CLARK CORRENTE
United States Attorney

/s/ MARY ROGERS
MARY ROGERS
Assistant U.S. Attorney
RI Bar #3107
U.S. Attorney's Office
50 Kennedy Plaza, 8th FL
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
email mary.rogers@usdoj.gov

CERTIFICATION OF SERVICE

On this 17th day of September, 2007, I caused the Government's Response to Defendant Adolfo Verdugo's Motion to Revoke or Amend Detention Order to be filed electronically and it is available for viewing and downloading from the ECF system.

Electronic notification:

William T. Murphy, Esquire
William T. Murphy Law Offices, Inc.
312 Turks Head Building
PO Box 9623
Providence, RI 02940-9623
Email: wtm@wtmurphy.com

/s/ MARY ROGERS
MARY ROGERS
Assistant U.S. Attorney
RI Bar #3107
U.S. Attorney's Office
50 Kennedy Plaza, 8th FL
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
email mary.rogers@usdoj.gov