IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>Plaintiff, | ) | |
| vs. | ) | CR07-100-04S |
| ADOLFO VERDUGO<br>Defendant | ) | |

**DEFENDANT ADOLFO VERDUGO'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO SUPRESS ORAL AND TANGIBLE EVIDENCE**

Adolfo Verdugo has filed a motion to suppress alleged oral and tangible evidence arising out of two encounters with law enforcement officials. For the following reasons, the alleged evidence should be suppressed.

**BACKGROUND**

*The Indictment*

In a three-count indictment naming five defendants the United States of America charged Mr. Verdugo with one count of conspiracy to distribute and possess with intent to distribute in excess of five kilograms of cocaine in violation of 21 U.S.C §§841(a)(1) and (b)(1)(A) and 21 U.S.C. §846.

*The Massachusetts Encounter*

Around 2:30 in the morning on May 30, 2007 in a highway rest stop off Interstate 91 in Holyoke, Massachusetts law enforcement officials conducted an illegal arrest and interrogation of Mr. Verdugo and Esteban Arias-Cortez. Mr. Verdugo and Mr. Arias-Cortez were located in or near the stopped tractor trailer rig owned by Mr. Verdugo. Mr. Verdugo is the owner of the tractor trailer rig and had been the passenger in the tractor and Mr. Arias-Cortez had been the driver. This illegal encounter followed the arrest of three persons occupying two cars which had left the same rest area some time earlier. The government alleges a connection between the three vehicles can be established by recorded telephone calls among and between various cell phones.

Specifically, Omar Altamirano-Nunez, who was driving a Honda van, was arrested shortly after leaving the rest area. The government has stated that Mr. Altamirano was the target of an extensive investigation utilizing wiretaps on many phones. The second car that had left the rest area some time before law enforcement officials approached Mr. Verdugo and Mr. Arias-Cortez was a Jeep. Trooper Aaron Kane stopped the Jeep and identified the operator as Ildelfonso Betancourt-Rodriguez and the passenger as Rafael Hernandez-

Roque. These three persons in the two vehicles were all charged in the instant indictment.

Following the stop of the Jeep the government alleges that it observed an unzipped and open black duffel bag sitting on top of the rear seat containing several black brick like objects recognized by the officers as items being consistent with the manner by which cocaine is packaged into kilogram packages. At this time government agents seized 29 brick like objects.

The three arrestees were taken to State Police Charlton where they were fingerprinted, booked, re-advised of their Miranda rights in Spanish and given an opportunity to make a phone call, according to the government.

After the Jeep and the Honda left the rest area Massachusetts State Trooper Tom Martowicz and Trooper Frechette secured the rest area and prevented other vehicles from leaving. G/S MacIsaac, SA Cardello and TFO Francesconi also responded to the rest area. At this time Mr. Verdugo and Mr. Arias-Cortez were "interviewed" according to the DEA-6a form prepared by TFA Michael Naylor on 5-31-07. TFA Naylor further alleges that Mr. Verdugo consented to a search of the tractor trailer. A K-9 search produced no positive alerts and a visual search of the truck cab revealed four cell phones which were seized. TFA

Naylor reports that Mr. Verdugo admitted two cell phones were his - Cingular (909) 904-9396 and Nextel (909) 917-1393 - and Mr. Arias-Cortez admitted the other two cell phones - Verizon (760) 987-9611 and Nextel (760) 524-5175 - were his. According to TFA Naylor, these four phones were seized by Trooper Nartowicz and Mr. Verdugo and Mr. Arias-Cortez were given property receipts for them.

TFA Naylor further alleges that Mr. Verdugo and Mr. Arias-Cortez agreed to go with the agents to the Trooper Post in Northhampton. At the post, Mr. Verdugo and Mr. Arias-Cortez were photographed and fingerprinted. An ICE agent determined that Mr. Verdugo is a naturalized citizen and Mr. Arias-Cortez is a resident alien. Mr. Verdugo and Mr. Arias-Cortez were subsequently released.

An evidentiary hearing will reveal that contrary to TFA Naylor's claim that Mr. Verdugo was "interviewed" and consented to the search of his tractor trailer and agreed to go to the Trooper Post in Northhampton, Mr. Verdugo and Mr. Arias-Cortez were coerced by the several law enforcement official present into these actions in violation of the right to be free from all unreasonable searched and seizures. Upon information and belief, the court will hear that Mr. Verdugo and Mr. Arias-Cortez were at the outset of their encounter with police forced onto

the ground and handcuffed. No Miranda warnings were issued to either Mr. Verdugo or Mr. Arias-Cortez on this date. All discussions with Mr. Verdugo, whose native language is Spanish, occurred in English.

Mr. Verdugo had no further police contacts until nearly two months later when he was arrested on 7-25-07 in Pomona, California where he lives with his wife and two children.

*The California Encounter*

Mr. Verdugo lives at 2438 Valhalla Street in Pomona, California with his wife Maria Verdugo and their two children. Maria Verdugo does not speak English and speaks only Spanish. Following the above encounter in Massachusets on May 30, 2007, the United States of America indicted Mr. Verdugo on 7-11-07 in the United Stated District Court of Rhode Island.

Two weeks later, on 7-25-07 TFA Naylor and SA Cardello met with TFO Don Jones along with "several other officers from the Pomona Police Department" (see DEA-6, Naylor, 7-30-07) at approximately 12:15pm where they observed Mr. Verdugo, his wife Maria and their two children getting into a car. The police followed the car and stopped it some time later. TFA Naylor alleges that he asked Mr. Verdugo to step

from the vehicle and asked him if he understood English to which Naylor alleges Mr. Verdugo responded yes. TFA Naylor reports that he read Mr. Verdugo his Miranda warnings in English and that Mr. Verdugo indicated that he wanted to speak with the agents.

TFA Naylor further reports that Mr. Verdugo "admitted to delivering the 29 kilograms to Sprinfield MA but stated that he never 'picked up any cash.'"

Following this alleged admission police transported Mr. Verdugo to the Pomona, California Police Station where he was booked and processed. "While being video-taped TFA Naylor read Verdugo his Miranda rights and had Verdugo sign a Miranda Rights form. Verdugo signed the rights form and as the questioning began he stated he wanted a lawyer, TFA Naylor mentioned the questioning prior to being transported to the station on video-tape." (see DEA-6, Naylor, 7-30-07)

Upon information and belief, an evidentiary hearing will reveal that contrary to TFA Naylor's claim that Mr. Verdugo stated he understood English, the court will hear that Mr. Verdugo, while understanding rudimentary English, does not have a working proficiency in the English language.

*Post-Arrest Proceedings*

Following his arrest in California on 7-25-07 Mr. Verdugo was released with bail set at $250,000 by the California Central District court. On September 4, 2007 Mr. Verdugo, after traveling cross-country, appeared before Magistrate Judge Lincoln D. Almond in the United States District Court for the District of Rhode Island for his initial appearance and arraignment. Notwithstanding the California Court's decision to release Mr. Verdugo on bail, the Rhode Island Court refused to do so and held him without bail. Mr. Verdugo has remained in custody since that time. It should be noted that, upon information and belief, during both the California and Rhode Island court appearances Mr. Verdugo utilized the services of court interpreters so that he could understand the proceedings.

*The Overarching Investigation*

During the detention hearing help on September 4, 2007 the government advised the court about the nature of the overall investigation of the target organization which led to the arrest of Mr. Verdugo. The government stated that "the organization is huge. It is linked to Cartels, more than one in Mexico." (Transcript at 18) The pre-trial discovery disclosed to Mr. Verdugo thus far comprises

hundreds of wiretaps of many different cell phone conversations. The government by letter dated November 1, 2007 stated that "the government is in possession of copies of over 90,000 intercepts" from related investigations.

## ARGUMENT

In short, the legal arguments in support of suppressing all oral and tangible evidence derived from the Massachusetts and California encounters turn on the unreasonbleness of the police conduct during both encounters described above. As has been noted, Mr. Verdugo's motion to suppress relies on evidence not yet on the record given the scant and often redacted discovery provided so far by the government and also given that Mr. Verdugo would have the opportunity to testify at the suppression hearing. Accordingly, a more thorough legal analysis would follow the evidentiary hearing after Mr. Verdugo has had an opportunity to cross-examine government witnesses as well as put on his own witness. What follows here is merely a skeletal structure of legal arguments to be fleshed out following the requested evidentiary hearing.

*The Massachusetts Encounter*

The primary legal arguments in support of suppressing all oral and tangible evidence resulting from the

Massachusetts encounter are: (1) the police lacked any articulable suspicion to detain Mr. Verdugo and therefore violated his rights under Terry v. Ohio, 392 U.S. 1 (1968); and (2) that even if the police did possess articulable suspicion about Mr. Verdugo, the police conducted custodial interrogation of Mr. Verdugo in violation of his rights under Miranda v. Arizona, 384 U.S. 436 (1966); and (3) the failure by the police to communicate with Mr. Verdugo in Spanish invalidated any alleged consent or waivers as not freely, voluntarily, and intelligently given. *See, e.g.*, Schneckloth v. Bustamonte, 412 U.S. 218 (1973). At most, Mr. Verdugo may have acquiesced to police authority and acquiescence may not substitute for free consent. *See, e.g.* Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968).

Regarding the first argument above, Mr. Verdugo was not observed violating any law and, according to police reports, was "interviewed" solely on the basis of some intercepted phone calls. It is Mr. Verdugo's position that prior to interaction with police in the rest stop area, the police did not possess articulable suspicion against Mr. Verdugo on the basis of intercepted phone calls or on any other basis.

Regarding the second argument above, the United States Court of Appeals for the First Circuit has articulated the

following four factors to be applied in determining when a person is subject to custodial interrogation and thereby entitled to Miranda warnings:

> 1. whether the suspect was questioned in familiar or at least neutral surroundings;
>
> 2. the number of law enforcement officers present at the scene;
>
> 3. the degree of physical restraint placed upon the suspect; and
>
> 4. the duration and character of the interrogation.

U.S. v. Mittel-Carey, 493 F.3d 36 (1st Cir 2007).

Questioning Mr. Verdugo in the middle of the night at a highway rest stop with five police officers at the scene after forcing Mr. Verdugo to the ground and handcuffing him with the total police encounter lasting, perhaps, several hours, cannot reasonably be understood to comply with the four-factor standard above.

Regarding the third argument above, the failure of *the* police to arrange to have Spanish-speaking officers available to conduct all questioning of Mr. Verdugo falls far short of any standard of reasonableness given that the government has admitted that the underlying investigation was of a huge organization allegedly connected to Mexican drug cartels. It's clear that the government had access to Spanish-speaking officer because the police reports

indicate that the three persons arrested in Massachusetts on May 30, 2007 were Mirandized in Spanish. Mr. Verdugo's native language is Spanish and his wife Maria speaks only Spanish.

*The California Encounter*

The primary legal arguments in support of suppressing all oral and tangible evidence resulting from the California encounter are: (1) similar to third argument made in connection with the Massachusetts encounter, the failure by the police to communicate with Mr. Verdugo in Spanish invalidated any alleged consent or waivers as not freely, voluntarily, and intelligently given; and (2) by invoking his right to counsel during a videotaped interview at the Pomona police station Mr. Verdugo effectively precluded from admission into evidence any subsequent statements.

The first argument above is especially persuasive as applied to the California encounter because, upon information and belief, the Pomona, California area comprises many - and perhaps even predominantly - Spanish speaking residents. Furthermore, it appears that Mr. Verdugo executed a consent to search his Pomona home on a form printed in Spanish. This form was signed by Officer Machado of the Pomona Police Department. Accordingly,

Officer Machado presumably speaks Spanish and would have been available to communicate with Mr. Verdugo in his native tongue. There likely were several other officers available to speak Spanish to Mr. Verdugo. By avoiding this obvious accommodation to Mr. Verdugo, the police acted unreasonably and violated Mr. Verdugo's Miranda rights. Therefore, all subsequent evidence derived must be suppressed as fruits of the poisonous tree under the teachings of Wong Son v. United States, 371 U.S. 471 (1963) and Segura v. United States, 468 U.S. 796 (1984). See also U.S. v. Gaviria, 775 F.Supp.495 (R.I. 1991)(granting motion to suppress in favor of Spanish-speaking defendant where Miranda warnings given in English)

Regarding the second argument above, it is clear that once a defendant invokes his or her sixth amendment right to assistance of counsel, the government must scrupulously honor that request by stopping all questioning immediately. *See. e.g.* Brewer v. Williams,, 430 U.S. 387 (1977). Here, TFA Naylor violated Mr. Verduogo's right to counsel by continuing to question Mr. Verdugo after his invocation of such a right. This violation occurred on videotape and would be available for the court to review at the requested evidentiary hearing.

## CONCLUSION

For the foregoing reasons, Mr. Verdugo respectfully requests that this court grant his motion to suppress.

Respectfully submitted,
Adolfo Verdugo
By his attorneys,

/s/ Joseph J. Voccola
Joseph J Voccola, Esq. #4132
454 Broadway
Providence RI 02903
Phone (401) 751-3900
Fax (401) 751-8983

/s/ John F. Lusi
John F. Lusi, Esq. #4949
128 Dorrance St., Suite 400
Providence RI 02903
Phone (401) 274-6200
Fax (401) 274-6201
jlusi@cox.net

Certificate of Service

We, the undersigned, hereby certify that on the 19th day of December, 2007 we caused a true copy of the within memorandum of law to be filed, via electronic case filing, to the following counsel of record:

Assistant U.S Attorney Mary Rogers
Office of the United States Attorney
50 Kennedy Plaza, Fleet Center, 8th Floor
Providence RI 02903
mary.rogers@usdoj.gov

usariecf@usdoj.gov

/s/ Joseph J. Voccola
Joseph J Voccola, Esq. #4132
454 Broadway
Providence RI 02903
Phone (401) 751-3900
Fax (401) 751-8983
sue@joevoccolalawoffices.com

/s/ John F. Lusi
John F. Lusi, Esq. #4949
128 Dorrance St., Suite 400
Providence RI 02903
Phone (401) 274-6200
Fax (401) 274-6201
jlusi@cox.net