IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA )
)
vs. ) Cr. No. 07-100S
)
ADOLFO VERDUGO )

GOVERNMENT'S POST HEARING OBJECTION TO
DEFENDANT'S MOTION TO SUPPRESS ORAL AND TANGIBLE EVIDENCE

Comes now the United States of America, by and through its attorneys, Robert Clark Corrente, United States Attorney, and Mary Rogers, Assistant United States Attorney, and objects to Defendant's Motion to Suppress Oral and Tangible Evidence for reasons stated in the accompanying Memorandum.

Respectfully submitted,

UNITED STATES OF AMERICA

By its Attorneys,

ROBERT CLARK CORRENTE
United States Attorney

/s/ MARY ROGERS
MARY ROGERS
Assistant U.S. Attorney
RI Bar #3107
U.S. Attorney's Office
50 Kennedy Plaza, 8th FL
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
email mary.rogers@usdoj.gov

CERTIFICATION OF SERVICE

On this 11th day of February, 2008, I caused the Government's Post Hearing Objection to the Defendant's Motion to Suppress Oral and Tangible Evidence and Memorandum in Support of said Objection to be filed electronically and it is available for viewing and downloading from the ECF system.

Electronic notification:

Joseph J. Voccola, Esq.
454 Broadway
Providence, RI 02909

John F. Luis, Esq.
128 Dorrance Street, Suite 400
Providence, RI 02903

/s/ MARY ROGERS

MARY ROGERS
Assistant U.S. Attorney
RI Bar #3107
U.S. Attorney's Office
50 Kennedy Plaza, 8th FL
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
email mary.rogers@usdoj.gov

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | Cr. No. 07-100S |
| | ) | |
| ADOLFO VERDUGO | ) | |

GOVERNMENT'S POST HEARING MEMORANDUM IN SUPPORT OF ITS OBJECTION TO DEFENDANT'S MOTION TO SUPPRESS ORAL AND TANGIBLE EVIDENCE

May 30th, 2007 Detention

The evidence presented at the motion to suppress shows that, at the time Massachusetts State Police Officer Thomas Nartowicz approached the tractor trailer in which Adolfo Verdugo (Verdugo) was located, law enforcement collectively had articulable suspicion to inquire of the vehicle's occupants further. Terry v. Ohio, 392 U.S. 1, 21 (1968). Cellular telephone conversations intercepted from November of 2006 through May of 2007, in San Diego, Rhode Island, and Massachusetts, had revealed that individuals in all three States were involved in trafficking multi kilograms of cocaine from California to the Northeast. Law enforcement was also aware that much of the conversation was occurring over target Juan Carlos's cellular telephones.[1] Starting on May 26, 2007, there was definitive evidence that a shipment of cocaine would be coming to Juan Carlos (Government's Exhibit 1, **Verdugo**: "Get ready for me a . . . a little dinner over there by Monday more or less I think." **Juan Carlos**: "we are ready."). Then the following day, May 27, 2007, law enforcement was aware that the shipment would be a substantial quantity; 29 kilograms. (Government's Exhibit 2, **Unidentified male (UM)/Mexico**:

[1] Later identified as Omar Altamirano-Nunez, a/k/a Juan Carlos Diaz Delgadillo, a/k/a Burras.

"My mom, is going over there." **Juan Carlos**: "I'm . . waiting for her." **UM**: "the month of February brings 29.") Increased visual surveillance was then coupled with the interceptions of Juan Carlos' telephones. Starting at approximately 10 p.m. on May 29, 2007, Juan Carlos, in a Honda minivan, was followed from Providence Rhode Island up to the Springfield, Massachusetts area. During this time period both he and the occupants of the Jeep Cherokee, Idelfonso Betancourt-Rodriguez, a/k/a Chacho (Betancourt) and Rafael Hernandez-Roque (Roque), were under continuous surveillance. The cryptic telephone intercepts, all in Spanish, coupled with the experienced case agent's interpretation of them as coded conversation orchestrating a drug exchange, and the added fact that it was an unusual time for anyone to be driving up to Springfield, Massachusetts, all led to the inescapable conclusion that, at a minimum, there was articulable suspicion against all four men. The remaining piece to the puzzle was for law enforcement to locate the fourth individual in the "tractor trailer." Case agent Michael Naylor testified that he interpreted the intercepts as indicating that the individual who was bringing the 29 kilograms (see Government's Exhibit 2, "the month of February brings 29") to Springfield (see Government's Exhibit 5, **Verdugo**: "where the Simpsons live") would be driving a tractor trailer (see Government's Exhibit 5, **Juan Carlos**: "we'll stay, sleep . . ." **Verdugo**: "I sleep here, here in this one." **Juan Carlos**: "Instead if you arrive and stay around someplace it's better, you understand?" **Verdugo**: "Well all right. Let me see if I see, because to go into those places with this car it's fucked up."). Agent Naylor explained that Verdugo was stating that it would seem strange for a tractor trailer, especially one with a sleeper cab, to pull into a motel to spend the night. The actions of the Defendants subsequently verified Agent Naylor's interpretation; Juan Carlos, Betancourt, and Roque were then followed to Springfield,

Massachusetts and Juan Carlos and his two associates checked into a motel, at approximately 12:50 a.m. on what was now May 30, 2007.

The next layer of evidence available to law enforcement was Verdugo's telephone call to Juan Carlos at 2:23 a.m. on what was now May 30, 2007 (see Government's Exhibit #15, **Verdugo**: "I'm here also." "I'm going up 91 North already." **Juan Carlos**: "okay. So then I'll head over there, and from there you can look for a good spot and we'll go there.") Hard on the heels of this call, Juan Carlos and his two associates left the motel, at 2:23 a.m., and began driving up route 91 northbound, using what appeared to be counter surveillance tactics.[2] There then followed a series of telephone calls between Verdugo and Juan Carlos, as Verdugo gave directions to where he was located. (See Government's Exhibit #16, **Verdugo**: "I'm here by exit . . . 21."; Government's Exhibit #17, **Juan Carlos**: "I'm getting off on 21."; Government's Exhibit #18, **Verdugo**: "we are here at the scenic (rest) area"; Government's Exhibit #19, **Verdugo**: ""I'm here still by the view area." "Get in between me and the other one." **Juan Carlos**: "The guy is with me, . . . he is bringing one of those Cherokees." **Verdugo**: "You tell him . . to come here and get in between" "Tell him to get in between the two *trucks* . . tell him to get in front . ."; Government's Exhibit #20, **Juan Carlos**: "Chacho, you are going to get in there . . . You are going to get in between the two of them , there's two, the black one and you know which one is the guy's." **Chacho**: "so you said there are two?" **Juan Carlos**: "In between the two." "Turn everything off.")

[2] It is equally plausible that the Defendants were simply lost, but the test is what information did the police have at the time. At the time they believed, given the very light traffic at that hour, that the Defendants were trying to ascertain whether they were being followed.

Monitors interpreting these Spanish conversations into English relayed the information to the various members of law enforcement conducting visual surveillance. The police watched as the vehicles traveled from the motel, up route 91 North, took exit 21, turned around and proceeded southbound on 91 to a Scenic (rest) area, where the Jeep Cherokee with occupants Betancourt and Roque pulled in front of Verdugo's truck; a position that also put the Cherokee in between two tractor trailer trucks. Significantly, there were only two tractor trailer trucks in the rest area at the time. The Cherokee was there for approximately 60 seconds, with no doors opening on the driver's side, leading to the reasonable belief that the transfer took place from the passenger's side of both vehicles. The Cherokee then drove back out of the rest area, with a simultaneous telephone call by Roque to Juan Carlos, with **Roque** stating, "I'm ready." "I'm ready." and **Juan Carlos** stating, "I'm driving very slow" and directing him to "pass me by." (see Government's Exhibit 21). Within less than two minutes **Juan Carlos** called Betancourt and repeated, "pass me." (see Government's Exhibit 22). Then 15 seconds later **Juan Carlos** called **Verdugo** and asked, "it's everything okay?" and **Verdugo** replied, "Yes, everything is fine . . it's done." (See Government's Exhibit 23).

State police officer Nartowicz immediately drove into the rest area to make sure no vehicles left. As he was in an unmarked vehicle and in plain clothes, he waited for a marked state police cruiser. He then interacted with the occupants of both tractor trailer trucks in the rest area. The first tractor trailer had license plates from a southern state, not the expected California plates. The engine was cold, evidence that it had been there for some time, the operator appeared to have been asleep, and he did not speak with a Spanish accent.

The second trailer, which the Cherokee had parked "in front of" as directed by Verdugo,

(see Government's Exhibit 19) had two occupants who did not immediately exit upon being told to do so by the police. The engine was still warm, indicating that it had arrived a short time before, and the tractor had a California license plate. There was ample probable cause at that point, and without a doubt, probable cause existed once the occupants began to speak, revealing their Spanish accents.

It is hard to conceive of a case having more clear cut probable cause that a drug transaction had just occurred involving the occupants of the tractor trailer at that point in time. Probable cause exists where the facts and circumstances within the officers' knowledge and of which they have reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed. Brinegar v. United States, 338 U.S. 160 (1949). The standard to be applied is the totality of the circumstances test. Illinois v. Gates, 462 U.S. 213 (1983). Probable cause may be evaluated on the basis of the *collective* knowledge of all the police officers engaged in a particular investigation. United States v. Paradis, 802 F.2d 553 (1st Cir. 1986), United States v. Curry, 751 F.2d 442 (1st Cir. 1984). Reasonableness is the test. The word probable does not mean "more likely than not" or "by a preponderance of the evidence." The evidence necessary to establish probable cause must be more than what amounts to mere suspicion, but considerably less than what is required for conviction. The standard is only the probability of criminal activity, not a prima facie showing. United States v. Drake, 673 F.2d 15 (1st Cir. 1982); United States v. Melvin, 596 F.2d 492 (1st Cir.), cert. denied, 444 U.S. 837 (1979).

The initial approach to the tractor trailer was, without question, legitimate pursuant to Terry v. Ohio, 392 U.S. 1, 21 (1968) (police must be free to pursue "legitimate investigative

function[s]"). "A police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." Id. The Supreme Court has also held that these investigatory powers include stopping motor vehicles upon reasonable suspicion. See, e.g., Michigan v. Long, 463 U.S. 1032, 1049 (1983). The two prong test enunciated in Terry requires a determination as to "whether the officer's action was justified at its inception, and whether the action taken was reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. "[T]he police officer must be able to point to specific and articulable facts, which taken together with rational inferences form those facts, reasonably warrant the intrusion. United States v. Kimball, 25 F.3d 1, 6 (1st Cir. 1994)(quoting Terry, 392 U.S. at 21). The second prong requires an examination of the totality of the circumstances, see United States v. Cruz, 156 F.3d 22,26 (1st Cir. 1998), while keeping in mind that "it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. Terry, 392 U.S. at 23.

The facts in this case support the government's contention that, although there was sufficient probable cause to arrest both Verdugo and Arias-Cortes after they exited the truck cab on May 30, 2007, neither individual was ever in "custody" as contemplated in Miranda, and thus Miranda warnings were never required. The mere fact that they were handcuffed initially, does not turn a detention or seizure into a formal custodial arrest. Police presence combined with the detention of an individual does not automatically give rise to a finding that an individual has been arrested. See Flowers v. Fiore, 359 F.3d 24 (1st Cir. 2004)(Police Officers' stop of a vehicle, drawing weapons, subsequent handcuffing of suspect, and placement in the back of the

cruiser before searching the vehicle did not rise to the level of de facto arrest. The actions were taken for the officer's safety and immediately following no discovery of weapons the suspect was released from the cruiser and the handcuffs were removed.); United States v. Taylor, 162 F.3d 12 (1st Cir. 1998) (Investigatory stop of automobile based on suspicion of drug activity was not converted into a *de facto* arrest by facts that officers had weapons drawn, there were 10 to 12 officers on the scene, occupants of automobile were placed face-down on the ground and frisked, egress of automobile was blocked by police cruisers and stop lasted approximately 30 minutes.); United States v. McCarthy, 77 F.3d 522 (1st Cir. 1996)(A 75 minute un-cuffed detention in the cruiser was not considered a *de facto* arrest.); United States v. Trueber, 238 F.3d 79 (1st Cir. 2001)(An officer's intention to arrest does not factor into whether a legal Terry stop becomes an arrest and thus requires a Miranda warning.); United States v. Acosta-Colon, 157 F.3d 9 (1st Cir. 1998)(The use of handcuffs in the course of an investigatory stop does not automatically convert the encounter into a *de facto* arrest.) An interview with the police may have some coercive aspects simply by virtue of the role that they carry out in the law enforcement system, but police are not required to give *Miranda* warnings to every one they question. U.S.C. S. v. Pratt, 645 F.2d 89 (1st Cir. 1981).

Also relevant to the determination of whether the detention of Verdugo and Arias-Cortes were in custody, is the fact that, according to Verdugo's own testimony, he was employed in the commercial trucking business. He had been stopped by the police before, not just during his arrest in Texas in 2006, but as part of regulations applying to the trucking business. Tr. Vol. 5, pages 38-39. Commercial truck is a highly regulated industry permitting warrantless inspections of vehicles. United States v. Maldonado, 356 F.3d 130, 135 (1st Cir. 2004), citing New York v.

Burger, 484 U.S. 691, 700 (1987)(joining three "sister circuits in holding that interstate commercial trucking is a pervasively regulated industry capable of supporting recourse to the administrative search exception). As noted in United States v. Burch, "Because Defendant was operating a carrier that is closely regulated, he had a 'significantly reduced expectation of privacy' in his trailer." 153 F.3d 1140, 1142 - 1143 (10th Cir. 1998). This line cases also supports the warrantless search and seizure of the telephones found in the cab of the truck.

However, the seizure of the cellular telephones in the truck cab is also permissible under the well established line of cases, permitting warrantless searches of vehicles where probable cause exists to believe the vehicle contains contraband. The facts are clear that, at the time Group Supervisor Daniel MacIsaac entered the cab, probable cause existed to believe that the two men, Verdugo and Arias-Cortes, had been involved in a drug transaction involving the use of cellular telephones to facilitate that transaction. Therefore, the seizure of the phones was valid. Maryland v. Dyson, 527 U.S. 465, 467 (1999)(*per curiam*)(the automobile exception to the warrant requirement is satisfied if there is probable cause to believe a car contains contraband); Pennsylvania v. Labron, 518 U.S. 938, 940 (1996)(*per curiam*)(if probable cause exists to believe a vehicle contains contraband, the Fourth Amendment permits police to search the vehicle without more): United States v. McCoy, 977 F.2d 706, 710 (1st Cir. 1992)(the only essential predicate for a valid warrantless search of an automobile is probable cause to believe that the vehicle contains contraband).

In summary, based upon the collective knowledge of the police, probable cause existed at the time that Massachusetts State Police officer Nartowicz entered the cab to do a protective sweep, at which time he noted the four cellular telephones. When Group Supervisor MacIsaac

held up the telephone that had just rung after Agent Naylor dialed the number on which the drug transaction had been occurring, and Verdugo stated that it was his, Verdugo was not under arrest and thus not entitled to *Miranda* warnings.

However, the credible evidence presented by the government, and by the Defendant, through Agent MacIsaac, is that Verdugo was repeatedly *Mirandized* and thus waived those rights and all admissions made by him are admissible. The consistent testimony of Trooper Nartowicz, Agent MacIsaac, and Immigration and Customs (ICE) Agent Arnold, all provided credible evidence that the Defendant, Verdugo was *Mirandized* in both English and Spanish. This certainly meets the government's burden of a mere preponderance of evidence. On the other hand, the Defendant, Verdugo's testimony was not credible; it contradicted not just the agent's but even his own ever-changing version. While Verdugo and his companion, Arias-Cortez, were initially handcuffed, this did not convert the detention to a *de facto* arrest. The police did a protective sweep of the cab of the truck for their own safety, and the telephones were noted. Agent Naylor, who was aware that the Cherokee had been stopped containing a large quantity of cocaine, and who was with Juan Carlos, called Verdugo's telephone using Juan Carlos' telephone. Verdugo's telephone rang at the Rest area. The Defendant admitted at the time that it was his telephone, and he admitted again at the police station when he signed a receipt for the telephone. The Defendant admitted that he had been advised that he was not under arrest. The Defendant was driven back to the police barracks, but Arias-Cortez drove the truck unaccompanied back to the barracks. Although not required, as the evidence shows that Verdugo was not under arrest, he was *Mirandized* on at least two occasions that night. The Defendant's testimony that he was never *Mirandized* is simply not credible. See Transcript, Volume 5,

January 25, 2008. Ms. Rogers: "So you're saying the entire time you were in the company of law enforcement on May 30th, 2007, not once were you advised of your rights under Miranda in either English or Spanish" Verdugo: "Yes. That's what I'm saying. No one did . And that was on the 30th." Tr. Vol.5, page 49. Compare to Tr. Vol. 5, page 58, Mr. Voccola: "Do you remember whether or not rights were read to you in Spanish at the Northampton police barracks?" Verdugo: "No." Mr. Voccola: "You do not remember?" Verdugo: "I don't remember."

Finally, because the Defendant had clearly been *Mirandized* in Spanish at the Northhampton Barracks, before he signed the receipt acknowledging that the cellular telephones were his, the evidence is admissible on those grounds as well. The First Circuit has held that, even if a Defendant's initial statement was obtained in violation of Miranda, the admissibility of a subsequent statement made after Miranda warnings is governed by Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). In Elstad, the Supreme Court held that if a statement obtained in violation of Miranda is nevertheless voluntary, a subsequent statement is not subject to the fruit of the poisonous tree analysis applicable to a constitutional violation. See id. at 309, 105 S.Ct. 1285. Instead, the admissibility of any subsequent statement should turn ... solely on whether it is knowingly and voluntarily made. Id. "In deciding the voluntariness of the later statement, a valid waiver of Miranda rights is normally dispositive: A subsequent administration of Miranda warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. Id. at 314, 105 S.Ct. 1285." United States v. Esquilin, 208 F.3d 315 (1st Cir. 2000).

July 25th, 2007 Arrest Pursuant to Warrant

The Defendant was arrested on July 25, 2007, in California pursuant to a valid federal arrest warrant. The arrest warrant was issued on July 11, 2007, based upon a sealed indictment against this Defendant on the charge of conspiracy to distribute and to possess with intent to distribute over 5 kilograms of cocaine. 21 U.S.C. § 841. The Defendant raised no challenge to the validity of the arrest warrant, which was admitted as a full exhibit (Government's Exhibit 37) during the Defendant's motion to suppress. The Supreme Court, as well as the First Circuit, have held that, even if tainted or incompetent evidence is presented to a grand jury, that is not a basis for dismissing the indictment. United States v. Blue, 384 U.S. 251 (1966); United States v. Maceo, 873 F.2d 1 (1st Cir. 1989)("A court should not inquire into the sufficiency of the evidence before the indicting grand jury because the grand jury proceeding is a preliminary phase of the criminal justice process and all constitutional protections will be afforded during the trial."); United States v. Hastings, 847 F.2d 920 (1st Cir. 1st 1988)(dismissal of indictments is a "rocky road to travel" and should not be done except in extreme cases.); United States v. Friedland, 444 F.2d 710 (1st Cir. 1971)(citing United States v. Blue, the First Circuit held, "the use of evidence before the grand jury that would be inadmissible at trial is generally not grounds for reversal.").

Thus, the only issue regarding the admissibility of the Defendant's statements is the credibility of members of law enforcement and the Defendant's testimony which was less than candid and, at best, extremely evasive. The Court may consider the fact that on several occasions, the Defendant initially refused to answer questions posed by the prosecutor, and instead asked to speak with his attorney. By contrast, the testimony by members of law enforcement was straightforward and consistent. The Defendant was stopped by a patrol officer,

pursuant to a valid arrest warrant, and asked for identification, to ensure that the correct individual would be arrested. The Defendant was then asked to step out of his vehicle, he complied, and was first put into the back of a patrol car, and then removed, *Mirandized*, and then questioned. The Defendant made several incriminating statements. After this occurred, the Defendant was transported back to the Pomona Police Station where the police anticipated the Defendant would continue to cooperate. The Defendant was placed into a room with a video camera. The Defendant was read his Miranda warnings yet again, and this time, to the surprise of the Agents, the Defendant asked for an attorney. As stated in its original memorandum, the government is not seeking to admit any statements made by the Defendant after he asked for an attorney. However, the statements made by Agent Naylor, seeking to confirm that the Defendant had spoken at the time of his arrest, are relevant to the Court's determination of the credibility of the Defendant's testimony. At no time does the Defendant deny speaking with Agent Naylor prior to the video interview. At no time does he deny that he made incriminating admissions. Also relevant to contradict his ever-shifting theory of whether he understood English, is the fact that the Miranda warnings were read to him in English, and he clearly understood them. And he asked for an attorney.

There are numerous examples of why the Defendant's testimony is simply not credible. In addition to refusing to answer straightforward questions, asking to speak with his attorney while on the stand during cross examination, the defendant even contradicted himself. The Defendant testified that he was 41 years old, that he came to the United States when he was 19. So by his own admission, he been in the United States for at least 22 years; certainly a substantial amount of time in which to learn English. And he admitted that he passed an English proficiency

exam in order to become a citizen, and that he has been a United States citizen since the year 2000. He went on to testify that, in 2006, when arrested in Texas, he was *Mirandized* in English and that he understood his rights at that time. Tr. Vol. 5, page 22. The Defendant understood he had a right to an attorney, one would be appointed if he could not afford one and that he did not have to speak if he did not want to. Verdugo: "Yes. Yes, I understood." Tr. Vol. 5, page 22. The Defendant then apparently remembered his theory that he really did not understand English. When questioned about keeping records in English for his trucking business, and reading signs on the highway in English he was evasive at best. Tr. Vol. 5, pages 23 - 28. When asked how many time Arias Cortez had driven with him in the tractor trailer, after his attorney objected to the question, Verdugo asked, "To what time are you referring to?" He then responded, "No, no. That was the first time." Tr. Vol. 5, page 30. If that was the first time Arias-Cortez had driven in the tractor trailer with Verdugo, there would be no need to clarify the time period. The Defendant continued his evasive testimony when asked how many times he had made deliveries to New England. Tr. Vol 5, pages 31 - 32. Then the Defendant claimed he did not even know how long he had been at the rest area prior to the police arriving, even whether it was "an hour, had you been there ten minutes, had you been there the entire day?" Verdugo: "I don't know. I'm not sure. . . I can't answer that. I don't know." Tr. Vol 5, pages 32 - 33. This testimony is not believable. The Defendant's explanation as to why he was heading the wrong way on the highway if he was making a delivery to Hatfield, was also compelling evidence of his lack of candor or truthfulness. Tr. Vol. 5, pages 35 - 36; 40 - 41. The Defendant claimed that "there were quite a few" uniformed officers present at the rest area on May 30, 2007. Tr. Vol. 5, page 37. This is contradicted by the evidence. There were not sufficient uniformed police officers at

the time. Officer Nartowicz, in plain clothes and an unmarked vehicle, had to wait 5 minutes for a marked unit, and Roque and Betancourt traveled quite a distance from route 91 onto route 90 eastbound before a marked unit could catch up to stop them. Trooper Aaron Kane had to travel out of his area because there were no other available units. Juan Carlos was stopped even further east on Route 90, again because there was a waiting period to find an available marked unit.

When asked whether Verdugo heard the Jeep Cherokee pull in front of his tractor trailer, the Defendant asked to speak with his attorney before answering. Tr. Vol 5, page 39. When told by the Court that he had to answer, Verdugo attempted repeatedly to avoid answering the question. First he answered, "No. I didn't *see* anything. Question, "Did you *hear* it?" Answer: "I didn't *see* anything, no." It was not until the fourth time the question was asked that the Defendant claimed that he did not hear anything. Tr. Vol 5, pages 39-40. Then, when asked if either he or Mr. Arias-Cortez had any interaction with anyone in the Jeep Cherokee, once again, the Defendant asked to talk to his attorney before answering. Tr. Vol. 5, page 42 - 43.

The Defendant admitted that he was told he was not under arrest. And he made no claim that he did not understand the English language regarding this. Tr. Vol. 5, page 46. His protest on the stand was that he wanted to stay and rest. "Why would I want to go to the police station?" This is hardly grounds for a claim of undue coercion. Then he claimed he was taken in "the front cruiser" but changed it to being driven in "an unmarked vehicle," perhaps remembering that he had already testified on direct that he was not in a patrol car, but a detective's car. Tr. Vol. 5, page 47, Tr. Vol 4, page 53.

During the Defendant's testimony concerning his arrest in California, the Defendant first

claimed that he did not recognize Agent Naylor, but then changed mid stream and claimed that he recognized Agent Naylor from Massachusetts. Tr. Vol.5, pages 50 - 51 The record is clear that Agent Naylor was never present at either the Rest area or the Northhampton Barracks in Massachusetts. The Defendant claims that Agent Naylor handcuffed him and said that he was under arrest. The Defendant then claims that he signed a consent to search his house, "first of all, because it was in Spanish, and then because I knew I didn't have anything in my house. I didn't have any drugs or anything. And also, Naylor told me that if I didn't sign it, he could get it with a judge." Tr. Vol. 4, page 60. Nothing in his testimony, even if believed, creates grounds to suppress evidence seized at his house on July 25, 2007.

Defendant Verdugo made a significant slip up in his testimony, when clearly aggravated with having to answer questions from the government's attorney, he testified remembering that Agent Naylor handcuffed him, "*He was there . . . he read my rights*. *He kept reading and reading* and talking and talking. He was confusing me. Tr. Vol. 5, page 51. Defendant now claims that he was never read his rights, but when he became exercised, he slipped up, and told the truth, Agent Naylor did advise the Defendant of his rights.

In summary, the Defendant's testimony is demonstrably false. The government has clearly met its burden by a mere preponderance of the evidence, that the Defendant was advised of his rights under Miranda, that he waived those rights, and made incriminating statements. His consent to search his house in California was voluntary. Thus, all evidence obtained as the result of the arrest in California is admissible.

## III. CONCLUSION

For all of the foregoing reasons, Defendant's motion to suppress should be denied.

Respectfully submitted,

UNITED STATES OF AMERICA

By its Attorneys,

ROBERT CLARK CORRENTE
United States Attorney

/s/ MARY ROGERS

MARY ROGERS
Assistant U.S. Attorney
RI Bar #3107
U.S. Attorney's Office
50 Kennedy Plaza, 8th FL
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
email mary.rogers@usdoj.gov

CERTIFICATION OF SERVICE

On this 11th day of February, 2008, I caused the Government's Post Hearing Objection to the Defendant's Motion to Suppress Oral and Tangible Evidence and Memorandum in Support of said Objection to be filed electronically and it is available for viewing and downloading from the ECF system.

Electronic notification:

Joseph J. Voccola, Esq.
454 Broadway
Providence, RI 02909

John F. Luis, Esq.
128 Dorrance Street, Suite 400
Providence, RI 02903

/s/ MARY ROGERS

MARY ROGERS
Assistant U.S. Attorney
RI Bar #3107
U.S. Attorney's Office
50 Kennedy Plaza, 8th FL
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
email mary.rogers@usdoj.gov